Filed 1/26/21  P. v. Gonzales CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT GONZALES,<br><br>    Defendant and Appellant. | B304024<br>(Los Angeles County<br> Super. Ct. No. NA072796) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos, Supervising Deputy Attorney General, Seth M. Friedman and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Robert Gonzales appeals from an order summarily denying his petition for resentencing under Penal Code section 1170.95[1] after the appointment of counsel, briefing, and a hearing. He contends that the trial court erred by relying on statements made in the appellate opinion from his direct appeal from the judgment of conviction. We conclude that the trial court appropriately relied on our prior opinion, in which we held that sufficient evidence supported defendant's second degree murder conviction based on a theory that defendant was an actual killer who acted with malice aforethought. We affirm the order.

## FACTUAL BACKGROUND[2]

1. *Prosecution Evidence*

Defendant was part of a group of gang members who killed Christopher Ash, a 204th Street gang member accused of "snitching" on another 204th Street gang member (Jonathan Fajardo) regarding the murder of Cheryl Green. In separate proceedings, Fajardo, Daniel

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     We previously granted defendant's request to take judicial notice of the prior appellate record and opinion to "establish the facts and circumstances underlying [his] conviction." We recite the factual and procedural background from the record on appeal in this case, and from defendant's prior appeal in *People v. Gonzales* (Aug. 13, 2013, B237860) [nonpub. opn.] (*Gonzales I*).

2

Aguilar, and Raul Silva were convicted for first degree murder in connection with Ash's murder.[3]

## A. *The Green Murder*

On December 15, 2006, Fajardo fired on a group of individuals gathered in the driveway of a home, killing Green and wounding three other individuals. As part of an investigation, police officers executed search warrants and searched the residences of various individuals connected to the 204th Street gang. During the search of Ash's apartment, the police took Ash into custody for questioning and escorted seven other individuals, including Fajardo, Aguilar, and Jose Covarrubias, out of Ash's apartment.

## B. *The Ash Murder*

Covarrubias, another member of the 204th Street gang and accomplice in Ash's killing, was the key prosecution witness at trial.[4] According to Covarrubias, Ash was murdered inside Silva's residential garage on December 28, 2006.

---

[3]     At defendant's trial, gang experts established that despite being a member of a different gang (the Fries Street gang), defendant acted for the benefit of the 204th Street gang during the commission of Ash's murder.

[4]     In exchange for testifying truthfully against his accomplices, Covarrubias pled guilty to voluntary manslaughter and was sentenced to 22 years imprisonment.

In the late afternoon of December 28, 2006, Covarrubias and three other 204th Street gang members (Silva, Aguilar, and Eugenio Claudio) drove to Silva's house. The men entered the garage and saw defendant (who Covarrubias had never met before) and an unidentified woman. When the woman left a few minutes later, Fajardo and Juan Carlos Pimentel, another member of the 204th Street gang, arrived at the garage. Pimentel pulled Covarrubias aside, at which time Covarrubias told him that he believed Ash was a snitch.

According to Covarrubias, all seven men—including defendant— discussed the matter together. Pimentel stated, "[w]e're gonna [*sic*] take care of Christopher Ash because of some snitching." Pimentel told Covarrubias to follow his lead and "tear up" Ash's body whenever he arrived. Everyone agreed that Aguilar would bring Ash to the garage, where he would be killed. Defendant offered to drive Aguilar to pick up Ash, and before leaving, defendant gave Covarrubias and Pimentel a knife.[5]

Approximately 20 minutes later, defendant and Aguilar returned to the garage with Ash. After Ash entered the garage, Fajardo struck him from behind with the butt of a shotgun. According to Covarrubias, Ash replied, "What the fuck? I'm not a snitch" before defendant, Aguilar, Silva, and Claudio rushed over and began punching him. Pimentel told everyone to calm down. As he walked Ash toward a Pepsi machine, Pimentel stabbed Ash in the neck, causing him to fall down.

_____

[5]     Covarrubias provided ambiguous and conflicting statements about defendant furnishing a knife.

Pimentel stabbed Ash in the chest, and Covarrubias stabbed Ash in the stomach before vomiting and dropping the knife.

Defendant then "pushed [Covarrubias] to the side," picked up the knife, and rapidly stabbed Ash "a lot of times" in the stomach before Pimentel turned Ash over and stabbed him in the back. The men wrapped Ash's body in a tarp and blanket, and placed the body inside a van. Fajardo and Pimentel left in the van while the other men, including defendant, stayed behind to clean up the garage with water and paint thinner. The police discovered Ash's body the same evening on December 28. Ash died of stab wounds, 11 to the chest and 32 to the abdomen.

The prosecution played for the jury a February 7, 2007 interview between defendant and the police wherein defendant provided inconsistent and false statements about the murder. Defendant first denied that he had been at Silva's home the night of December 28, 2006, and he denied meeting Ash, Covarrubias, and Aguilar. Later, defendant admitted that he had seen Ash at Silva's residence and that the murder had occurred, but claimed that he was inside the home when Ash was killed. Finally, defendant admitted that he had heard the other men talk about a snitch; that he and Aguilar had picked up Ash; and that when they returned, someone hit Ash with a stick, at which time defendant left the garage.

2.   *Defense Evidence*

Defendant testified on his own behalf and denied any involvement in Ash's murder. Defendant denied hearing a conversation about

planning to stab someone.  Defendant agreed to pick up Aguilar's "friend," and when they arrived at the garage, defendant saw someone hit Ash in the back of the head with an object.  At that point, defendant left and went inside Silva's residence.

### 3.     *Information, Verdict, and Sentence*

Defendant was charged with first degree murder (§ 187, subd. (a)), three special circumstances allegations, an allegation of personal use of a deadly weapon (a knife) (§ 12022, subd. (b)(1)), and a gang enhancement (§ 186.22, subd. (b)(1)(C)).

The jury was instructed on multiple theories of culpability for murder, including first degree premeditated murder, second degree murder based on malice aforethought but without deliberation and premeditation, and a homicide that was the natural and probable consequences of an intentional act—either assault with a deadly weapon or intimidating a witness by force—committed with conscious disregard for human life.

By general verdict on May 3, 2011, the jury acquitted defendant of first degree murder, but convicted him of second degree murder.  The jury found the gang enhancement to be true, but found the personal use of a deadly weapon not to be true.  The court sentenced defendant to 15 years to life.

## PROCEDURAL BACKGROUND

Defendant challenged his conviction on two grounds in his direct appeal in *Gonzales I.*  As relevant here, defendant argued that his

murder conviction should be reversed because there was insufficient evidence to support liability for second degree murder.[6] He argued that the jury, by acquitting him of first degree murder, "necessarily rejected Mr. Covarrubias' testimony" that defendant was part of a group that agreed to kill Ash. He asserted that "[n]o jury could have reached a second degree murder conviction based upon the testimony of Mr. Covarrubias, who was clearly out to pin the murder on [defendant] to preserve the benefit of his bargain with the prosecution." Similarly, defendant argued the jury could have only reached its verdict on second degree murder based on the natural and probable consequences doctrine to which no evidence was presented that defendant intended to aid and abet an assault or witness intimidation.

We rejected these arguments and affirmed defendant's conviction. Because the jury's general verdict did not disclose which theory of liability it had relied upon to convict defendant of second degree murder, we began with the premise that defendant's conviction could be sustained on any theory presented to the jury that was supported by substantial evidence. (*People v. Curtin* (1994) 22 Cal.App.4th 528, 531.) Without determining whether the evidence supported the conviction on a natural and probable consequences theory, we concluded that "substantial evidence support[ed] the theory of second degree murder based upon the theory of a homicide committed with malice aforethought." (*Gonzales I*, *supra*, at p. 6.) Our conclusion was based

---

[6] Defendant also contended that the trial court erred when it denied his motion for new trial based on a claim of juror misconduct.

on "more than ample evidence" from which the jury "reasonably could have concluded that after defendant, Aguilar and Ash returned to the garage and Fajardo hit Ash on the back of the head . . . *defendant joined in the fatal assault upon Ash by stabbing him multiple times.*" (*Id.* at p. 6, original italics.) Our conclusion, we held, was not undermined by the jury's not true finding on the personal use of a deadly weapon. (*Id.* at p. 6, fn. 15, citing *People v. Brown* (1989) 212 Cal.App.3d 1409, 1421 [inconsistent verdicts are "within the province of the jury as an exercise of their mercy. It does not compel reversal of the conviction"], overruled on another ground in *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn. 10; *People v. Santamaria* (1994) 8 Cal.4th 903, 911; *People v. Lewis* (2001) 25 Cal.4th 610, 654–656].)

Following the enactment of Senate Bill No. 1437 (S.B. 1437), defendant filed a petition for resentencing under section 1170.95, which provides that persons who were convicted under theories of felony murder or murder under the natural and probable consequences doctrine, and who could no longer be convicted of murder following the enactment of S.B. 1437, may petition the sentencing court to vacate the conviction and resentence on any remaining counts. (Stats. 2018, ch. 1015, § 1, subd. (f).)

In his petition for resentencing, defendant stated that an information had been filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; at trial, he was convicted of second degree murder pursuant to the felony-murder rule or the natural and probable consequences doctrine; and he could not now be convicted of

8

second degree murder because of the changes made to sections 188 and 189. Defendant requested that counsel be appointed on his behalf.

The trial court appointed counsel for defendant, the People filed an opposition, and defendant filed a reply. At a hearing on the petition, defense counsel argued that the jury's not true finding on the personal use deadly weapon enhancement meant that it had rejected the factual theory that defendant stabbed Ash. Consistent with our opinion in *Gonzales I*, the court rejected the argument, reasoning that the jury could well have convicted defendant of second degree murder as an actual killer who acted with malice aforethought. In the alternative, the court found that defendant could have been convicted of direct aiding and abetting murder and conspiracy to commit murder, though neither theory was presented to the jury. The court summarily denied the petition for resentencing.

Defendant timely filed a notice of appeal.

## DISCUSSION

1. *Governing Law*

The legislature enacted S.B. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

S.B. 1437 also "added a crucial limitation to section 188's definition of malice for purposes of the crime of murder." (*People v.*

9

*Verdugo* (2020) 44 Cal.App.5th 320, 326 (*Verdugo*), rev. granted, S260493, Mar. 18, 2020.) Under the revised section 188, subdivision (a)(3), "'[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' [Citations.]" (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1135 (*Lewis*), rev. granted, S260598, Mar. 18, 2020.) Section 1170.95, as enacted by S.B. 1437, permits individuals who were convicted of felony-murder or murder under the natural and probable consequences doctrine, but who could not be convicted of murder following S.B. 1437's changes to sections 188 and 189, to petition the sentencing court to vacate the conviction and resentence on any remaining counts. (§ 1170.95, subd. (a); see *People v. Johns* (2020) 50 Cal.App.5th 46, 54 ["Now, a person so accused must have killed the victim, aided the person who did kill the victim with the intent to kill [them], or acted as a major participant in the felony with reckless indifference to human life"].)

A petition for relief under section 1170.95 must include a declaration by the petitioner that he is eligible for relief under section 1170.95 based on all the requirements of subdivision (a), the superior court case number and year of the petitioner's conviction, and a request for appointment of counsel, should the petitioner seek appointment. (§ 1170.95, subd. (b)(2).)

If the petition includes the required information, subdivision (c) of section 1170.95, prescribes "a two-step process" for the court to determine if it should issue an order to show cause. (*Verdugo, supra,* 44 Cal.App.5th at p. 327.) The court first "review[s] the petition and determine[s] if the petitioner has made a prima facie showing that the

10

petitioner falls within the provisions of this section." (§ 1170.95, subd. (c).) The court then appoints counsel, if requested, and reviews the petition a second time after briefing by the parties to determine if petitioner has established a prima facie case for relief. (*Ibid.*; see *Lewis, supra*, 43 Cal.App.5th at p. 1140.) At this stage, the court may review the petitioner's record of conviction to determine whether the allegations set forth in the petition are untrue as a matter of law. (*Verdugo, supra*, at p. 333; *Lewis, supra*, 43 Cal.App.5th at p. 1138, quoting Couzens et al., Sentencing Cal. Crimes (The Rutter Group 2019) ¶ 23:51(H)(1), pp. 23–150 to 23–151.) If the court concludes the petitioner has made a prima facie showing, it must issue an order to show cause. (§ 1170.95, subd. (c); *Verdugo, supra*, at p. 328.)

"Once the order to show cause issues, the court must hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts." (*Verdugo, supra*, 44 Cal.App.5th at p. 327, citing § 1170.95, subd. (d)(1).)

2.    *Analysis*

Defendant contends the trial court erred by relying on our prior opinion to summarily deny his petition for resentencing. He asserts this was error because the opinion contains hearsay statements that do not fall within an exception to the hearsay rule, and because the trial court made independent factfinding beyond the theories on which the jury was instructed.

11

We agree that the trial court should not have engaged in judicial factfinding to find defendant culpable of theories that were neither charged by the People nor presented to the jury. The court's error is of no moment, however, as our prior opinion establishes that defendant is ineligible for relief as a matter of law. (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12 ["'we review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm'"]; *People v. Edwards* (2020) 48 Cal.App.5th 666, 675 [any procedural errors by the trial court "were harmless under any standard of review [citations] and remand would be an idle act" because defendant did not fall within the provisions of § 1170.95 as a matter of law].)

The trial court properly utilized *Gonzales I* to determine the basis of defendant's conviction—that defendant was an actual killer who acted with malice aforethought—to determine whether the allegations in his petition were untrue as a matter of law. "A court of appeal opinion, whether or not published, is part of the appellant's record of conviction" that may be reviewed when ruling on a section 1170.95 petition. (*Verdugo*, *supra*, 44 Cal.App.5th at p. 333; *People v. Cruz* (2017) 15 Cal.App.5th 1105, 1110.) Analogous petitioning procedures for resentencing under sections 1170.18 and 1170.126 contemplate a similar gatekeeping function in which trial courts review the record of a petitioner's conviction to determine if the allegations set forth by the petitioner are untrue as a matter of law. (See *People v. Washington* (2018) 23 Cal.App.5th 948, 955 [§ 1170.18]; *People v. Oehmigen* (2014) 232 Cal.App.4th 1, 6–7 [§ 1170.126].) As section 1170.95 makes clear, petitions under this new law are no exception. (See § 1170.95, subd.

(b)(2) ["[i]f any of the information required" under subdivision (a) is missing, the court may deny the petition unless the information can be "readily ascertained by the court"]; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 249 [to "readily ascertain[]" missing information, court must be permitted to consider documents outside the petition, including the record of conviction].)

When considering defendant's record of conviction during the prima facie stages of review, the trial court should have limited its review to determining whether the petitioner is ineligible for relief as a matter of law. (*Verdugo*, *supra*, 44 Cal.App.5th at pp. 328–330.) To do so, the trial court could (and did) look at *Gonzales I* "for the nonhearsay purpose of determining the basis of" defendant's conviction. (*People v. Woodell* (1998) 17 Cal.4th 448, 459.) The "basis of the conviction" may be established when an appellate opinion "logically shows what the original trial court found," including "the issue the jury has to resolve in determining whether the conviction is a qualifying one." (*Id.* at p. 460; accord, *People v. Trujillo* (2006) 40 Cal.4th 165, 180 ["an appellate court decision . . . can be relied upon to determine the nature of a prior conviction because it may disclose the facts upon which the conviction was based"].)

Here, defendant was required to make a prima facie showing that he "*could not* be convicted of first or second degree murder because of changes to Section 188 or 189" following the enactment of S.B. 1437. (§ 1170.95, subd. (a)(3), italics added.) Our prior opinion in *Gonzales I* makes clear—and defendant does not dispute—that the jury was

13

instructed on a theory of culpability for second degree murder based on defendant acting with malice aforethought as an actual killer. S.B. 1437 did not alter the law regarding criminal liability for this category of offender. (Stats. 2018, ch. 1015, § 1, subds. (f), (g).)

Indeed, we rejected defendant's argument on direct appeal that substantial evidence did not support a theory that he was an actual killer. We held that "substantial evidence supports the theory of second degree murder based upon the theory of a homicide committed with malice aforethought." (*Gonzales I, supra*, at p. 6.) Such basis for defendant's conviction means that defendant cannot demonstrate, as a matter of law, that he could not now be convicted of second degree murder. We shall not disturb our prior holding in this appeal. (See *Lewis, supra*, 43 Cal.App.5th at pp. 1138–1139; *People v. Garcia* (2020) 57 Cal.App.5th 100, 108; *People v. Gray* (2005) 37 Cal.4th 168, 196–197.) Therefore, the court did not err in denying the petition for resentencing.

//

//

//

//

//

//

//

//

//

14

**DISPOSITION**

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

COLLINS, J.

CURREY, J.